IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SELINA MARIE RAMIREZ, | § | |
| individually and as Independent | § | |
| Administrator of, and on behalf of, the | § | |
| ESTATE OF GABRIEL EDUARDO | § | |
| OLIVAS and the heirs-at-law of | § | |
| GABRIEL EDUARDO OLIVAS, and as | § | |
| parent, guardian and next friend of and | § | |
| for female minor S.M.O.; and | § | CIVIL ACTION NO. 3:19-cv-01529-L |
| GABRIEL ANTHONY OLIVAS, | § | |
| individually, | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| CITY OF ARLINGTON, TEXAS; | § | |
| JEREMIAS GUADARRAMA; and | § | |
| EBONY N. JEFFERSON, | § | |
|     Defendants. | § | |

---

## DEFENDANT CITY OF ARLINGTON'S MOTION TO DISMISS UNDER RULE 12(b)(6) AND BRIEF FILED IN RESPONSE TO FIRST AMENDED PLAINTIFFS' ORIGINAL COMPLAINT

---

Robert Fugate
Texas Bar No. 00793099
robert.fugate@arlingtontx.gov
Cynthia Withers
Texas Bar No. 00791839
cynthia.withers@arlingtontx.gov

City of Arlington
City Attorney's Office
Mail Stop #63-0300
P.O. Box 90231
Arlington, Texas  76004-3231
Telephone (817) 459-6878
Facsimile (817) 459-6897

ATTORNEYS FOR DEFENDANT
CITY OF ARLINGTON, TEXAS

# **TABLE OF CONTENTS**

Table of Contents ............................................................................................. i

Table of Authorities ........................................................................................ ii

I.    Identification of Live Pleadings and Procedural Background ............................1

II.   Grounds for Dismissal ...................................................................................3

III.  Factual Background .......................................................................................4

IV.  Applicable Procedural Standard for Rule 12(b)(6) ..........................................4

V.   Arguments and Authorities .............................................................................5

      A.   Plaintiffs' own version of facts demonstrate that no Fourth
           Amendment violation occurred given the scenario the officers faced .........5

           1.  Plaintiffs' factual allegations ...............................................................6

           2.  Discussion of *Rockwell v. Brown* ...........................................................8

           3.  Discussion of *Elizondo v. Green* ........................................................12

           4.  Application of law to alleged facts ......................................................14

      B.   All claims against Arlington fail under *Monell* ........................................17

           1.  Escalation of force policy .................................................................18

           2.  Taser use policy .............................................................................19

           3.  Continuation of employment of Officer Guadarrama ..........................20

           4.  Failure to discipline .........................................................................21

      C.   Plaintiffs' factual allegations fail to show deliberate indifference
           by, or a causal connection to, Arlington's training program ....................21

VI.  Relief .........................................................................................................25

Signature ........................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................................................................................... 4-5

*Bazan v. Hidalgo Cnty.*,
246 F.3d 481 (5th Cir. 2001) ........................................................................ 11

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ....................................................................................... 4-5

*Burge v. St. Tammany Parish*,
336 F.3d 363 (5th Cir. 2003) ........................................................................ 22

*City of Canton, Ohio v. Harris*,
489 U.S. 378 (1989) .................................................................................... 21-22

*Collier v. Montgomery*,
569 F.3d 214 (5th Cir. 2009) ........................................................................ 13

*Elizondo v. Green*,
671 F.3d 506 (5th Cir. 2012) ...................................... 1, 3, 5-6, 8, 12-14, 17, 18

*Evans v. City of Houston*,
246 F.3d 344 (5th Cir. 2001) ........................................................................ 17

*Fraire v. City of Arlington*,
957 F.2d 1268 (5th Cir. 1992) ...................................................................... 11

*Gonzales v. Westbrook*,
118 F.Supp.2d 728 (W.D. Tex. 2000) ...................................................... 22, 25

*Graham v. Connor*,
490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) ......................... 10, 17, 19-20

*Hill v. Carroll Cnty., Miss.*,
587 F.3d 230 (5th Cir. 2009) ........................................................................ 10

*James v. Harris Cnty.*,
577 F.3d 612 (5th Cir. 2009) .......................................................................... 5

*Manis v. Lawson*,
585 F.3d 839 (5th Cir. 2009) ........................................................................ 10

*Monell v. Dep't of Soc. Servs.*,
436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) .................................... 3, 5, 17, 20-21

*Ontiveros v. City of Rosenberg, Tex.*,
564 F.3d 379 (5th Cir. 2009) ................................................................................... 10-11

*Peterson v. City of Fort Worth, Tex.*,
588 F.3d 838 (5th Cir. 2009) .......................................................................................... 22

*Pineda v. City of Houston*,
291 F.3d 325 (5th Cir. 2002) .......................................................................................... 18

*Ramirez v. Knoulton*,
542 F.3d 124 (5th Cir. 2008) .......................................................................................... 13

*Rockwell v. Brown*,
664 F.3d 985 (5th Cir. 2011) .............................................................. 8-12, 15, 17, 19-20

*Tennessee v. Garner*,
471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed. 2d 1 (1985) ................................................. 13, 18

*Thompson v. Upshur County*,
245 F.3d 447 (5th Cir. 2001) .......................................................................................... 22

*Valle v. City of Houston*,
613 F.3d 536 (5th Cir. 2010) ............................................................................................ 5

## STATUTES

42 U.S.C. § 1983 .......................................................................................... 2, 5, 17, 22

## FEDERAL RULES

Fed. R. Civ. P. 12(b)(6) .................................................................................... 1, 4, 6, 25

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SELINA MARIE RAMIREZ, et al., | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:19-cv-01529-L |
| | § | |
| CITY OF ARLINGTON, TEXAS, et al., | § | |
|     Defendants. | § | |

---

**DEFENDANT CITY OF ARLINGTON'S MOTION TO DISMISS
UNDER RULE 12(b)(6) AND BRIEF
FILED IN RESPONSE TO
FIRST AMENDED PLAINTIFFS' ORIGINAL COMPLAINT**

---

TO THE HONORABLE JUDGE LINDSAY,
UNITED STATES DISTRICT JUDGE:

Defendant City of Arlington, Texas ("Arlington") respectfully files its Motion to Dismiss Under Rule 12(b)(6). Plaintiffs' version of the factual scenario facing the officers fails to state a Fourth Amendment violation. In the absence of a constitutional violation, there can be no municipal liability. *See Elizondo v. Green*, 671 F.3d 506, 510-11 (5th Cir. 2012). Further, Plaintiffs' factual allegations do not show that Arlington's policies were unconstitutional or that they caused harm to Mr. Olivas. Last, Arlington's training program was not deliberately indifferent to the rights of Mr. Olivas.

## I.   Identification of Live Pleadings and Procedural Background

1.01    Plaintiffs' live pleading is their First Amended Plaintiffs' Original Complaint filed on August 7, 2019.[1]  Plaintiffs allege that Mr. Olivas's civil rights were

---

[1] *See* First Amended Plaintiffs' Orig. Complaint, Doc. 19, 08/07/19 (PageID 205-58).

violated and seek redress under 42 U.S.C. § 1983.[2]   Plaintiffs allege that Mr. Olivas threatened to "kill himself, by lighting himself on fire after dousing himself with gasoline."[3]   Plaintiffs further allege Mr. Olivas was "drenched with gasoline" in the presence of the police officers.[4]   Plaintiffs allege that Sgt. Jefferson and Officer Guadarrama acted in an unreasonable manner for "Tasing" Mr. Olivas, which Plaintiffs allege caused Mr. Olivas's death.[5]

1.02   With regards to Arlington, Plaintiffs assert liability under *Monell* by alleging that Arlington's "policy regarding escalation in force was a moving force behind and proximately caused Mr. Olivas' death".[6]   Plaintiffs allege that Arlington acted unconstitutionally by not adopting an absolute policy that – in all circumstances – prohibited police officers "from using a Taser on a person who had been doused with gasoline."[7]   Plaintiffs also complain that Arlington continued to employee Officer Guadarrama after reprimanding him for various infractions, none of which involved the use of force.[8]   Last, Plaintiffs argue that Arlington's failure to discipline Sgt. Jefferson and Officer Guadarrama for the events involving Mr. Olivas is "evidence" of a "pre-existing unconstitutional policy, practice, and/or custom."[9]

1.03   Although Plaintiffs make repeated and detailed references to Sgt. Jefferson's and Officer Guadarrama's training on Tasers,[10] Plaintiffs may also allege that

---

[2]*See id.* at p.5, ¶ 6 (PageID 209).
[3]*See id*. at p.7, ¶ 12 (PageID 211).
[4]*See id*.
[5]*See id*. at p.38, ¶ 93 (PageID 242).
[6]*See id.* at pp.40-42 (PageID 244-46).
[7]*See id.* at p.42, ¶ 102 (PageID 246).
[8]*See id.* at pp.42-43, ¶ 103 (PageID 246-47).
[9]*See id.* at p.44, ¶ 104 (PageID 248).
[10]*See id*. at pp.33-38 (PageID 237-42).

Arlington's training was not proper because some Taser related training was for "internal credit" and allegedly "not up to standards required for training to be reported to TCOLE."[11]   This claim, if it is a claim, is addressed in an abundance of caution.

1.04   Arlington and the individual defendants previously filed motions to dismiss in response to the original complaint.[12]   Although Plaintiffs did not identify the changes in their first amended complaint, Plaintiffs' changes were primarily minor tweaks to their factual allegations.[13]   Plaintiffs did not address the substantive arguments made in the defendants' original motions to dismiss; Plaintiffs only response was that Defendants' previous motions were moot because of their amended complaint.[14]

## II.  Grounds for Dismissal

2.01   First and foremost, Plaintiffs' version of the factual scenario facing the officers fails to state a Fourth Amendment violation for excessive force.   In short, Plaintiffs' fail to allege an unconstitutional use of force by Sgt. Jefferson or Officer Guadarrama given the scenario faced by the Arlington police officers.   "[I]n the absence of a constitutional violation, there can be no municipal liability for the City."   *Elizondo v. Green*, 671 F.3d 506, 510-11 (5th Cir. 2012).   Thus, all claims against Arlington should be dismissed.

---

[11]*See id.* at p.39, ¶ 95 (PageID 243).
[12]*See* Defendant City of Arlington's Motion to Dismiss, Doc. 9, filed 07/17/19; Defendant Ebony N. Jefferson's Motion to Dismiss, Doc. 13, filed 07/26/19; Defendant Guadarrama's Motion to Dismiss, Doc. 16, filed 07/26/19.
[13]*Compare* Plaintiffs' Original Complaint, Doc. 1, filed 06/25/19 (PageID 1-52) *with* First Amended Plaintiffs' Original Complaint, Doc. 19, filed 08/07/19 (PageID 205-58).
[14]*See* Plaintiffs' Response to Defendants' Motions to Dismiss, Doc. 20, filed 08/07/19 (PageID 259-62).

2.02    Plaintiff only brings federal claims against Arlington.[15]  With regard to the claims brought against Arlington, Plaintiffs must show the alleged wrongful conduct of an employee is pursuant to policy or custom of Arlington.  *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691 (1978).  Plaintiffs' policy claims are based on (1) Arlington's escalation of force policy, (2) Arlington's Taser use policy, (3) the continued employment of Officer Guadarrama, and (4) Arlington's decision not to discipline Sgt. Jefferson and Officer Guadarrama regarding the incident at issue in this lawsuit.   Plaintiffs *Monell* claims should be dismissed because the alleged facts, considered in the light most favorable to the Plaintiffs, fail to show any constitutional violation.

2.03    If Plaintiffs assert a failure to train claim, the claim fails because Plaintiffs own allegations show that Arlington's training was not deliberately indifferent to Mr. Olivas's constitutional rights.

### III.  Factual Background

3.01    Plaintiffs' factual allegations are stated in their Complaint and discussed herein in the relevant analytical sections.[16]

### IV.  Applicable Procedural Standard for Rule 12(b)(6)

4.01    Rule 12(b)(6) recognizes that the failure to state a claim upon which relief can be granted is a defense to the challenged claim.  FED. R. CIV. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The plausibility

---

[15]*See* First Amended Plaintiffs' Original Complaint, Doc. 19, pp.47-50, filed 08/07/19 (PageID 251-54).
[16]*See id*. at pp.6-44 (PageID 210-48).

standard requires more than simply alleging facts that indicate relief is possible.  *Id.*  "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss."  *Id.* at 679 (citing *Twombly*, 550 U.S. at 556).

## V.  Arguments and Authorities

5.01    Arlington's motion presents two independent grounds.  First, Arlington cannot be liable on the facts alleged because the Plaintiffs' own version of facts show that the Arlington police officers did not violate the Fourth Amendment. *See Elizondo v. Green*, 671 F.3d 506, 510-11 (5th Cir. 2012).   Second, the Plaintiffs' version of facts demonstrates that Arlington's policies did not violate the Constitution and were not the cause of Mr. Olivas's death.  Further, Arlington's training policies were not deliberately indifferent to Mr. Olivas's constitutional rights. Plaintiffs have failed to identify a policy or practice by Arlington that caused their alleged harm.  *See Monell,* 436 U.S. at 690-91.

### A.    Plaintiffs' own version of facts demonstrate that no Fourth Amendment violation occurred given the scenario the officers faced.

5.02    Before considering municipal policy under *Monell*, Plaintiffs must meet the threshold requirement of alleging facts showing a constitutional violation.  "To hold a municipality liable under § 1983 for the misconduct of an employee, <u>a plaintiff must show, in addition to a constitutional violation,</u> that an official policy promulgated by the municipality's policymaker was the moving force behind, or actual cause of, the constitutional injury."   *James v. Harris County*, 577 F.3d 612, 617 (5th Cir. 2009) (underlining added).   "To establish municipal liability under § 1983, <u>a plaintiff must show the deprivation of a federally protected right</u> caused by action taken 'pursuant to an official municipal policy.'"  *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010) (underlining added).  "[I]n the absence of a constitutional violation, there can be no

municipal liability for the City." *Elizondo*, 671 F.3d at 510-11.   Plaintiffs' fact allegations fail to show a violation of Mr. Olivas's rights.   Accordingly, Plaintiffs' allegations do not meet the threshold requirement.   Thus, Plaintiffs have failed to state a claim against Arlington upon which relief can be granted.  *See* FED. R. CIV. P. 12(b)(6).

### 1.    Plaintiffs' factual allegations.

5.03    In order to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  The Plaintiffs' <u>factual</u> allegations include:

- "On July 10, 2017, Mr. Olivas was at home, telling family members that he would kill himself, by lighting himself on fire after dousing himself with gasoline."[17]

- "There is no doubt that all police officers at the scene of the incident leading to Mr. Olivas' death, at which he was Tased, were aware that Mr. Olivas was threatening to commit suicide."[18]

- "Officer Pierce also noted that Mr. Olivas poured gasoline at certain spots inside the home as well as all over himself, saying he was going to kill himself."[19]

- "The call text stated that the caller's father was threatening suicide.  The caller was Gabriel Anthony Olivas, and his father was Mr. Olivas.  The call text allegedly further indicated that Mr. Olivas was threatening to burn down the house and was pouring gasoline in the house."[20]

- Plaintiffs admit that Mr. Olivas "was holding" a lighter, but allege that he did not light the lighter.[21]

- "While driving to Mr. Olivas' home, police officers informed police dispatch to have Mr Olivas' son and whoever else was in the house with Mr. Olivas to exit the house."[22]

---

[17]*See* Plaintiffs' First Amended Original Complaint, p.7, ¶ 12 (PageID 211).
[18]*See id*. at ¶ 13.
[19]*See id*.
[20]*See id*. at p.8, ¶ 15 (PageID 212).
[21]*See id*.
[22]*See id*. at p.9, ¶ 16 (PageID 213).

- "Before Officer Scott's arrival, he asked dispatch where Mr. Olivas was located. Officer Scott was told that he was inside one of the bedrooms."[23]

- Corporal Ray "wrote that, on Monday, July 10, 2017, at 11:57 a.m., he was dispatched to Mr. Olivas' home regarding an alleged suicidal subject, high on methamphetamines, and who was pouring gasoline inside the home.  Corporal Ray indicated that, when he arrived, he was met by 'frantic family members yelling for officers to hurry and help their father.'"[24]

- Officer Guadarrama "wrote that, on Monday, July 10, 2017, at approximately 12:00 p.m., he was dispatched to Mr. Olivas' residence in reference to a suicidal individual who had been believed to have doused his residence with gas."[25]

- "Officer Guadarrama wrote that Sergeant Jefferson and Officer Elliot were the next officers to arrive at Mr. Olivas' home on July 10, 2017.  He wrote, 'Sergeant Jefferson reminded us to use non-lethal on the suicidal person.'"[26]

- "They entered the residence, and Officer Guadarrama 'very quickly detected the strong odor of gasoline inside the residence.'"[27]

- "As the officers entered into that bedroom, Officer Guadarrama 'knew that the suicidal male [Mr. Olivas] was inside the bedroom.'   Further, 'I [Officer Guadarrama] was concerned that the suicidal male would ignite the bedroom on fire igniting himself and innocent victims, because I could smell the very strong odor of gasoline inside the bedroom.'"[28]

- Sgt. Jefferson "heard dispatch send officers to Mr. Olivas' home in reference to a suicidal person.  He also heard that the person had poured gasoline on himself and in a room."[29]

- Sgt. Jefferson responded to the call and, upon arrival, ran to the door of Mr. Olivas's home, where he joined Officers Guadarrama and Elliot.[30]

- Before entering the house, Sgt. Jefferson saw that Officer Guadarrama had his firearm drawn and Sgt. Jefferson told Officer Elliot to draw "less lethal", which

---

[23] *See id.*
[24] *See id.* p.10, ¶19 (PageID 214).
[25] *See id.* at ¶ 20.
[26] *See id.* at p.11, ¶ 21 (PageID 215).
[27] *See id.*
[28] *See id.* at p.11, ¶ 22 (PageID 215).
[29] *See id.* at p.14, ¶ 30 (PageID 218).
[30] *See id.* at ¶¶ 30-32.

was an instruction to draw his Taser.[31]  Sgt. Jefferson also pulled his Taser "as a second less lethal option."[32]

• Sgt. Jefferson wanted to be able to immediately address whatever threat was encountered.[33]  Officer Guadarrama entered the residence, followed by Officer Elliot, and then Sgt. Jefferson.[34]

• Sgt. Jefferson smelled gas when they entered the room with Mr. Olivas.[35]

• "Officer Guadarrama told Officer Elliott that, some time back, he and other officers had responded to the home and discovered a man who possibly could be the same subject in the current call and who Officer Guadarrrma said was wanting suicide by cop."[36]

The alleged facts have some strong similarities to two recent Fifth Circuit opinions, both of which held that the police officers did not use excessive force.  *See Elizondo v. Green*, 671 F.3d 506 (5th Cir. 2012); *Rockwell v. Brown*, 664 F.3d 985 (5th Cir. 2011).

### 2. Discussion of *Rockwell v. Brown*.

5.04  *Rockwell v. Brown* also involved a family call to police regarding the actions of a suicidal family member (the son) who was holed-up in his bedroom in the family house.  664 F.3d 985, 988-89 (5th Cir. 2011).  The 27-year-old son suffered from bipolar disorder and schizophrenia.  *Id*. at 988.  His mental condition and stability began to deteriorate after he stopped taking his medications and refused to see a doctor.  *Id*.

5.05  One evening, the son was hitting the walls of his room, cursing through the door, and raised his fist as if to hit his mother.  *Id*.  Believing their son was a danger to himself and to others, the parents called 911.  *Id*.  The dispatcher advised the responding officers that the son was bi-polar, schizophrenic, and off of his medication.

---

[31]*See id*. at pp.14-15, ¶¶ 32-33 (PageID 218-19).
[32]*See id*. at p.15, 33 (PageID 219).
[33]*See id*. at ¶ 34.
[34]*See id*.
[35]*See id.*

*Id.* The son's mother confirmed to the officers that the son was schizophrenic and off his medications and also indicated her belief that the son was using illegal drugs. *Id.* at 989.

5.06     Officers Ohlde, Burleson, and Raley attempted to communicate with the son through his bedroom door, but were unsuccessful in their attempts to persuade the son to come out of the bedroom. *Id.* Officer Raley advised the others that a SWAT team had responded to a prior situation involving the son. *Id.* The officers called for a lieutenant and for a backup unit. *Id.* The son continued to bang on the walls, shake his door, and threaten the officers. *Id.* After Lt. Brown arrived, the officers decided to arrest the son because they feared he would harm his parents or himself if left in the house. *Id.*

5.07     The officers breached the bedroom door to make the arrest. *Id.* The son, holding two eight-inch serrated knives, rushed towards and attacked Lt. Brown. *Id.* Officer Burleson yelled "knives". *Id.* Lt. Brown fired multiple rounds at the son with the pepperball gun. *Id.* The son pushed Lt. Brown into the bathroom hard enough that the commode broke. *Id.* The son then ran after Officer Scicluna while swinging his knives. *Id.* at 989-90. Officer Scicluna was injured; at about this time, Officers Burleson, Raley, and Scicluna shot the son. *Id.* at 990. Stippling on the son's neck indicated that the son was less than two feet from Officer Raley when he fired. *Id.* Officer Garcia fired once or twice, but did not hit the son. *Id.* Officers Ohlde and Lt. Brown did not fire their firearms. *Id.* After EMS arrived, the son was pronounced dead. *Id.*

---

[36]*See id.* at p.17, ¶ 38 (PageID 221).

5.08     The parents sued the officers for excessive force in alleged violation of the Fourth Amendment.[37] *Id*. at 990-91.  The district court granted summary judgment to the officers on the excessive-force claims on the basis of qualified immunity.  *Id*. at 990.

5.09     In affirming, the Fifth Circuit began its analysis by noting that the required elements of an excessive force claim are: "(1) an injury (2) which resulted from the use of force that was clearly excessive to the need and (3) the excessiveness of which was objectively unreasonable."  *Id*. at 991 (citing *Hill v. Carroll Cnty., Miss.*, 587 F.3d 230, 233 (5th Cir. 2009)). The Fifth Circuit also reviewed the reasonableness standard, saying:

> As in other Fourth Amendment contexts, the "reasonableness" inquiry is objective: "the question is whether the officers' actions are 'objectively reasonable' <u>in light of the facts and circumstances confronting them</u>, without regard to their underlying intent or motivation."

*Id*. (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989) (underlining added)).  "The 'reasonableness' of a particular use of force <u>must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight</u>."  *Id*. (underlining added).  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Id*. (citing *Graham*, 490 U.S. at 396-97).  The Fifth Circuit completed its review of the standards, saying:

> "An officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer reasonably believes that the suspect poses a threat of serious harm to the officer or to others." *Manis [v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009)] (citing *Ontiveros v.*

---

[37]The parents also sued the officers for an alleged unlawful entry into the son's bedroom and state-law assault and battery claims.  *Rockwell*, 664 F.3d at 990-97.  Those claims are not discussed in this motion as they are not relevant, although the dismissal of the additional claims was also affirmed.  *Id*.

> *City of Rosenberg, Tex.*, 564 F.3d 379, 382 (5th Cir. 2009)). "The
> excessive force inquiry is confined to whether the [officer or another
> person] was in danger *at the moment of the threat* that resulted in the
> [officer's use of deadly force]." *Bazan v. Hidalgo Cnty.*, 246 F.3d 481,
> 493 (5th Cir. 2001) (citing *Fraire v. City of Arlington*, 957 F.2d 1268,
> 1276 (5th Cir. 1992) ("[R]egardless of what had transpired up until the
> shooting itself, [the suspect's] movements gave the officer reason to
> believe, at that moment, that there was a threat of physical harm.")).

*Rockwell*, 664 F.3d at 991 (italic emphasis and brackets in original, except for the addition of the full *Manis* citation).

5.10   Although the parties disagreed about when the first shot was fired, the evidence – viewed in the light most favorable to the parents – showed "that all of the shots were fired after Scott charged out of his room with a deadly weapon in each hand in the direction of the officers." *Id.* "Under the totality of the circumstances, then, it was reasonable for the officers to believe that Scott posed a significant and imminent threat of serious physical harm to one or more of the offices." *Id.* at 991-92. "Consequently, the officers' decision to respond to that threat with deadly force was justified." *Id.* at 992.

5.11   The Fifth Circuit completed its analysis by addressing the parents' argument that the Fifth Circuit should "examine the circumstances surrounding the forced entry, which may have lead to the fatal shooting, in evaluating the reasonableness of the officers' use of deadly force." *Id.* at 992.   The Fifth Circuit found this argument unavailing, saying: "It is well-established that '[t]he excessive force inquiry is confined to whether the [officer or another person] was in danger *at the moment of the threat* that resulted in the [officer's use of deadly force].'" *Id.* at 992-93 (citing *Bazan*, 246 F.3d at 493)).   Because "each of the officers had a reasonable belief that [the son] posed an imminent risk of serious harm to the officers" there was no need to "look at any other moment in time." *Id.* at 993.

5.12    Because the officers' use of deadly force was objectively reasonable, the Fifth Circuit held that the son's Fourth Amendment right to be free from the use of excessive force was not violated.  *Id*. at 993.  Accordingly, the Fifth Circuit did "not consider the issue of whether that right was clearly established."  *Id*.

> **3.    Discussion of *Elizondo v. Green*.**

5.13    *Elizondo v. Green* also involved a family call to police regarding the actions of a suicidal family member (17-year-old son) who was in his bedroom in the family house threatening harm to himself.  671 F.3d 506, 508 (5th Cir. 2012).  The son had attempted suicide just over a month earlier by stabbing himself.  *Id*.  The daughter called 911 after hearing a commotion between the mother and son.  *Id*.  The daughter was afraid the son would harm their mother, who was trying to take a knife from the son.  *Id*.

5.14    Officer Green received a dispatch call that mistakenly indicated that a man had stabbed himself and needed medical attention.  *Id*.  The officer went to the house to clear the scene for the paramedics.  *Id*.  The mother directed the officer to the son's room, where the officer found the son unhurt but holding a knife to his stomach.  *Id*.  The officer drew his weapon and backed out of the room while repeatedly ordering the son to put the knife down.  *Id*.  The son refused.  *Id*.  The son cursed the officer and yelled "Fucking shoot me."  The officer told the son that he did not want to hurt him, but that the officer would be forced to hurt the son if he came any closer.  *Id*.  The son moved closer and raised the knife.  *Id*.  The officer shot the son, who died from his wounds.  *Id*.

5.15    The parents brought suit against the officer and the City of Garland alleging that the officer used excessive force against the son in violation of the Fourth Amendment.  *Id*. The officer moved for summary judgment on the grounds of qualified

immunity.  *Id*. at 508-09.  The district court dismissed the excessive force claim against the officer "based on a determination that Green had not committed a constitutional violation, and dismissed all claims against the officer."  *Id*. at 509.  Afterwards, the city moved for summary judgment, which was granted.  *Id*.

5.16    The Fifth Circuit affirmed the dismissal for the city.  *Id*. at 508-11.  However, the Fifth Circuit did not consider the dismissal of the officer because the grant of summary judgment to the officer was not timely appealed.  *Id*. at 509-10.

5.17    The sole issue before the Fifth Circuit was whether, viewing the evidence most favorable to the parents, that the officer used excessive force against the son.  *Id*. at 510.  The Fifth Circuit reiterated the test, saying: "To establish the use of force in violation of the Constitution, a plaintiff must prove: '(1) injury, (2) which resulted directly and only from a use of force that was <u>clearly excessive</u>, and (3) the excessiveness of which was <u>clearly unreasonable</u>."  *Id*. (citing *Collier v. Montgomery*, 569 F.3d 214, 218 (5th Cir. 2009)) (emphasis added.).  "<u>The use of deadly force is constitutional when the suspect poses a threat of serious physical harm to the officer or others</u>."  *Id*. (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).  "In analyzing the reasonableness of the specific use of force, courts must consider the totality of the circumstances surrounding the officer's decision. *Id*. (citing *Ramirez v. Knoulton*, 542 F.3d 124, 128 (5th Cir. 2008)).

5.18    Applying the legal standard, the Fifth Circuit agreed "with the district court's conclusion that Green's use of deadly force was not clearly unreasonable."  *Id.* at 510.  The son "ignored repeated instructions to put down the knife he was holding and seemed intent on provoking Green."  *Id*.  "At the time Green discharged his weapon, [the son] was hostile, armed with a knife, in close proximity to Green, and moving closer." *Id*.

"Considering the totality of the circumstances in which Green found himself, it was reasonable for him to conclude that [the son] posed a threat of serious harm." *Id*. "Finally, in the absence of a constitutional violation, there can be no municipal liability for the City." *Id*. at 510-11. Accordingly, the summary judgment was affirmed. *Id*. at 511.

### 4.    Application of law to alleged facts.

5.19    In this case, the Plaintiffs' own factual allegations clearly demonstrate that Mr. Olivas posed a threat of serious harm to his own family members and to the officers. Plaintiffs' allegations demonstrate that:

Mr. Olivas was "high on methamphetamines".[38]

Mr. Olivas was suicidal.[39]

Mr. Olivas had soaked parts of the house in gasoline.[40]

The officers understood that Mr. Olivas threatened to burn the house down.[41]

Mr. Olivas's family members were in the bedroom with Mr. Olivas who had poured gasoline "at certain spots inside the home" and "drenched" himself with gasoline.[42]

Plaintiffs specifically admit that Mr. Olivas "was holding" a lighter when "he caught fire".[43]  Mr. Olivas also had a red plastic gas "can" that appeared to be a 2 or 2.5 gallon container.[44]

Plaintiffs admit that two of Mr. Olivas's family members (wife and son) were in the bedroom where the police officers located Mr. Olivas.[45]

Mr. Olivas's family members were repeatedly told to leave the house, but did not do so.[46]

---

[38]*See* First Amended Plaintiffs' Original Complaint, p.10, ¶ 19  (PageID 214).
[39]*See id*. at p.7, ¶¶ 12-13 (PageID 211).
[40]*See id*. at ¶ 13.
[41]*See id*. at  p.8, ¶ 15 (PageID 212).
[42]*See id*. at pp.7-8, ¶¶ 12-13 (PageID 211).
[43]*See id*. at p.9, ¶ 15 (PageID 15); *see also* pp.12-13 at ¶ 23 (PageID 215).
[44]*See id*. at p.19, ¶ 44 (PageID 223).
[45]*See id*. at pp.12-13, ¶ 25 (PageID 216-17); *see also* p.19, ¶ 44 (PageID 44).

The family members were frantic.[47]

Thus, Plaintiffs version of the facts show three Arlington police officers in a confined bedroom with frantic family members and a suicidal man soaked in gasoline threatening to light himself on fire (and with the means to do so), while gasoline was soaked throughout the house.[48]   These fact clearly demonstrate that the officers (all three) along with the family members were in danger at the moment of the threat that resulted in the use of the Taser.   *See Rockwell*, 664 F.3d at 991.   Moreover, the Plaintiffs' own version of events are clear that the officers would reasonably believe that Mr. Olivas posed a serious threat of harm to the officers, the family members, and himself.   *See id*.

5.20     The facts of the instant case mirror many of the facts in *Rockwell* and *Elizondo*.   The cases involve suicidal family members holed up in a bedroom threatening harm to themselves and others.   In this case, Officer Scott reported the call text said  that Mr. Olivas threatened to burn the house down.[49]   Plaintiffs acknowledge that Mr. Olivas "poured gasoline at certain spots inside the home as well as all over himself".["][50]   Further, Mr. Olivas had the means to ignite himself and the house with the lighter that he held. Officer Guadarrama was "concerned that the suicidal male would ignite the bedroom on fire igniting himself and innocent victims, because I could smell the very strong odor of gasoline inside the bedroom."[51]   The family members and officers were in clear danger based on the Plaintiffs' version of events.   The police officers acted reasonably.

---

[46]*See id*. at p.9, ¶ 16.; p.12, ¶ 23; pp.12-13, ¶ 25 (PageID 216-17).
[47]*See id.* at p.10, ¶ 19 (PageID 214).
[48]*See* cites immediately above to First Amended Plaintiffs' Original Complaint.
[49]*See* First Amended Plaintiff's Original Complaint, p.8, ¶ 15 (PageID 212).
[50]*See id.*, p.7, ¶ 13 (PageID 211).
[51]*See id*. at p.11, at ¶ 22 (PageID 215).

5.21    It is worth noting that the Arlington police officers – from the beginning – were trying to avoid using their firearms in their encounter with Mr. Olivas.  Before entering the house, Sgt. Jefferson reminded the officers to use "less lethal" (meaning Tasers) if possible.[52]  The Arlington police officers entered the house with two officers having Tasers drawn and one officer having his firearm drawn; Sgt. Jefferson implemented this strategy to have two "less lethal" options.[53]  Facing this desperate, rapidly evolving situation, the officers priority was to avoid using their firearms.[54]

5.22    Plaintiffs go so far as to argue that the Arlington police officers should have simply physically engaged Mr. Olivas while he was soaked in gasoline, high on methamphetamine, suicidal, and holding a lighter.[55]  For example, Plaintiffs argue:

> The fact that Officer Elliott was only 6 feet away from Mr. Olivas shows that Mr. Olivas could have easily been subdued by Officer Elliott, by Officer Elliott rushing and grabbing Mr. Olivas.[56]

The Plaintiffs suggestion that this feat would have been "easily" accomplished is nonsensical.  The Plaintiffs' proposed plan could have just as easily resulted in both Officer Elliot and Mr. Olivas being on fire in a room with frantic family members in a now burning house.  In any event, the Plaintiffs' hypothetical suggestions are the type of 20/20 hindsight analysis made in the cool of the afternoon with large doses of speculation; this type of analysis is far removed from the rapidly tense, uncertain, and rapidly evolving circumstances facing Sgt. Jefferson and Officers Guadarrama and Elliott.  Of course, the Courts have clearly rejected the type of post hoc analysis and

---

[52]*See id.* at p.11, ¶ 21, p.15, ¶ 33 (PageID 215, 219).
[53]*See id.* at p.15, ¶ 33 (PageID 219).
[54]*See id.*
[55]*See* First Amended Plaintiffs' Orig. Complaint, pp.21-22, ¶ 50, ¶ 52 (PageID 225-26).
[56]*See id.* at p.21, ¶ 50.

speculation suggested by the Plaintiffs.  *See Graham*, 490 U.S. at 396-97; *Rockwell*, 664 F.3d at 991.  This case, like *Rockwell* and *Elizondo*, should be dismissed because the use of force was reasonable under the totality of circumstances facing the officers.

### B.     All claims against Arlington fail under *Monell*.

5.23     In the present case, the Plaintiffs raise allegations about three policies, which allegedly caused a violation of Mr. Olivas's constitutional rights.[57]  First, Plaintiffs complaint about Arlington's escalation in force policy.[58]  Second, Plaintiffs complain that Arlington police officer's have discretion on when to use Tasers.[59]   Third, Plaintiffs argue that Arlington's continued employment of Officer Guadarrama   "caused Mr. Olivas' death".[60]   In addition, Plaintiffs contend that Arlington's decision not to discipline Sergeant Jefferson and Officer Guadarrama for the incident at issue in this lawsuit is "evidence of Arlington's pre-existing unconstitutional policy, practice, and/or custom."[61]

5.24     Arlington may not be held liable under § 1983 unless the wrongful conduct of an employee is pursuant to a policy or custom of Arlington.  *Monell*, 436 U.S. at 691.  An official municipal policy is "[a] policy statement, ordinance, regulation or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority."  *Evans v. City of Houston,* 246 F.3d 344, 358 (5th Cir. 2001).   Proof of municipal liability, sufficient to satisfy *Monell*, requires (1) an official policy or custom,

---

[57]*See* First Amended Plaintiffs' Orig. Complaint, pp.39-44, ¶¶ 96-104 (PageID 243-48).
[58]*See id*. at pp.40-41, ¶¶ 97-100 (PageID 244-46).
[59]*See id*. at p.42, ¶ 102 (Page ID 246).
[60]*See id.* at pp.42-43, ¶ 103 (PageID 246-43).
[61]*See id.* at p. 44, ¶ 104 (PageID 248).

of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) of a constitutional violation whose "moving force" is that policy or custom.  *Pineda v. City of Houston,* 291 F.3d 325, 328 (5th Cir. 2002).   Here, the Plaintiffs' factual allegations demonstrate that Arlington's policies were not the "moving force" behind any alleged constitutional violation.

### 1.    Escalation of force policy.

5.25    Plaintiffs make much ado about Arlington's use of force policy.[62]   But Arlington's use of force policy did not cause Mr. Olivas's injuries. Plaintiffs quibble about the order of the escalation policy.[63]   Plaintiffs specific complaint is that the use of an "Electronic Control Device" should be placed higher on the continuum than "Empty hand control", which includes fingertip pressure to pressure points and hard strikes to motorpoints with hands or feet.[64]   But the Fourth Amendment did not require the Arlington police officers to physically engage Mr. Olivas while he was soaked in gasoline, high on methamphetamine, suicidal, and holding a lighter.[65]   Rather, "[t]he use of deadly force is constitutional when the suspect poses a threat of serious physical harm to the officer or others."  *Elizondo*, 671 F.3d at 510 (citing *Garner*, 471 U.S. at 11).

5.26    Because the officers were not constitutional required to physically engage Mr. Olivas on the Plaintiffs' version of facts, Plaintiffs cannot show a causal link between the alleged defect in Arlington's use of force continuum policy and Mr. Olivas's injury. The officers were not required to physically engage Mr. Olivas regardless of whether the use of a "Taser" had been higher on the use of force continuum than the use of "Empty

---

[62]*See id.* at pp.40-42, ¶¶ 97-102 (PageID 244-46).
[63]*See id*. at pp.40-41, ¶¶ 97-99 (PageID 244-45).
[64]*See id.*

hand control".  Plaintiffs have not alleged facts showing a causal connection between Arlington's use of force continuum and Mr. Olivas's injuries.  The complaint about the use of force continuum policy fails to state a claim upon which relief can be granted.  *See Monell*, 436 U.S. at 691 (municipal policy must have "caused a constitutional tort").

5.27    In addition, the Fourth Amendment does not dictate ranking Taser use above the use of physical force.  Rather the use of force is constitutionally measured by reasonableness based on the particular circumstances of a particular case.  *Rockwell*, 664 F.3d at 991 (citing *Graham*, 490 U.S. at 397).  Thus, Plaintiffs have failed to identify a constitutional defect in Arlington's use of force continuum policy.

5.28    Last, Plaintiffs complain that Arlington's "use-of-force continuum contains no adjustment for and/or mention of a situation like that involving a situation like that involving Mr. Olivas."  As stated in the first three words of the continuum, it is applied "under normal circumstances".[66]  Encountering an individual threatening to commit suicide by fire after soaking his family's home and himself in gasoline falls outside of "normal" even on the spectrum of conduct faced by police officers.  In any event, a use of force continuum is a quick, practical overview.  The continuum cannot account for every bizarre situation that officers may face.  Rather, Taser use was covered in training.[67]  Plaintiffs complaint that Arlington's use of force continuum does not specifically address the bizarre situation created by Mr. Olivas fails to state a claim up on which relief can be granted because it fails to allege a constitutional violation.

**2.        Taser use policy.**

---

[65]*See* cites to First Amended Plaintiffs' Orig. Complaint in ¶ 5.19, above.
[66]*See* First Amended Plaintiffs' Original Complaint, p.40, ¶ 97 (PageID 244).
[67]*See id.* at pp.31-38 (PageID 235-42).

5.29    Plaintiffs also include a one paragraph contention faulting Arlington for not absolutely barring the use of Tasers on an individual "doused with gasoline."[68] Plaintiffs complain that officers had discretion, based on the facts they encountered, to determine whether Taser use was appropriate.   The Supreme Court and the Fifth Circuit clearly recognize that a "one-size-fits-all" rule is not proper in a Fourth Amendment analysis of the use of force; for example, the Fifth Circuit has explained:

> As in other Fourth Amendment contexts, the "reasonableness" inquiry is objective: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."

*Rockwell*, 664 F.3d at 991 (citing *Graham*, 490 U.S. at 397).   Accordingly, Arlington's decision not to absolutely "prohibit" an officer from using a Taser on a person "doused with gasoline" does not violate the Constitution.   The officers in this case had a stated goal to avoid using their firearms.[69]   In sum, Arlington's policy – as alleged by Plaintiffs – was consistent with the Constitution because the reasonableness of the use of a Taser must be evaluated in "light of the facts and circumstances" confronting the officers.

### 3.      Continuation of employment of Officer Guadarrama.

5.30    Plaintiffs further fault Arlington for the continued employment of Officer Guadarrama.[70]   Plaintiffs refer to a series of infractions that resulted in written reprimands or counseling reports.[71]   None of the allegations involve the use of force.[72] Because the disciplinary allegations are unrelated to the use of force, there can be no causal connection between the infractions and Mr. Olivas's death.   *See Monell*, 436 U.S.

---

[68]*See id*. at p.41, ¶ 100 (PageID 245).
[69]*See id*. at p.11, ¶ 21 (PageID 215), p.15, ¶¶ 33 (PageID 219).
[70]*See id*. at pp.42-43, ¶ 103 (PageID 246-47).
[71]*See id*.

at 691 (municipal policy must have "caused a constitutional tort"). The claim against Arlington for failure to terminate Officer Guadarrama prior to his encounter with Mr. Olivas should be dismissed for failure to state a claim.

### 4.      Failure to discipline.

5.31     Plaintiffs also insert a one paragraph contention that Arlington's "failure" to discipline Sgt. Jefferson and Officer Guadarrama is "evidence of Arlington's pre-existing unconstitutional policy, practice, and /or custom".[73]  Plaintiffs fail to identify any specific policy.[74]  However, every specific policy that Plaintiffs identified elsewhere has been addressed in this motion and none state a claim.  Moreover, Arlington's "failure" to discipline is no evidence of an improper policy because the alleged facts do not show a constitutional violation by the officers.  Further, Plaintiffs only argue the "failure" is evidence, not that it is a separate policy.

### C.      Plaintiffs' factual allegations fail to show deliberate indifference by, or a causal connection to, Arlington's training program.

5.32     It is not clear to Arlington whether Plaintiffs intend to assert a failure to train claim against Arlington.[75]  If asserted, the claim fails to state a claim upon which relief can be granted.   The facts repeatedly alleged by the Plaintiffs affirmatively demonstrate that Arlington did train its officers.  "[T]he adequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989).  In other words, the "failure to train

---

[72]*See id.*
[73]*See id.* at p.44, ¶ 104 (PageID 248).
[74]*See id.*
[75]*See* First Amended Plaintiffs' Original Complaint, pp.39-44, 47-50.

can amount to a policy if there is deliberate indifference to an obvious need for training where citizens are likely to lose their constitutional rights on account of novices in law enforcement." *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 849 (5th Cir. 2009).

5.33    "[D]eliberate indifference generally requires that a plaintiff demonstrate 'at least a pattern of similar violations' arising from training that is so clearly inadequate as to be 'obviously likely to result in a constitutional violation.'" *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003) (citing *Thompson v. Upshur County*, 245 F.3d 447, 459 (5th Cir. 2001)).   "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program.".   *City of Canton*, 489 U.S. at 390-91.   "[T]he inadequacy of training must be obvious and obviously likely to result in a constitutional violation."   *Thompson*, 245 F.3d at 459 (citing *City of Canton*, 489 U.S. at 390, n.10).   Moreover, it does not "suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct." *Id.* at 391.   Further, the alleged failure to train must have "actually caused" the constitutional violation. *See id.*   The Fifth Circuit has also held that "if a law enforcement department meets the state standards for the training of its law enforcement officers, the plaintiffs cannot sustain a failure to train cause of action under 42 U.S.C. § 1983." *See Gonzales v. Westbrook*, 118 F. Supp. 2d 728, 737 (W.D. Tex. 2000) (citing Fifth Circuit cases).

5.34    Plaintiffs repeatedly make factual allegations showing that Arlington's police officers, including specifically Sgt. Jefferson and Officer Guadarrama, were trained in the use of tasers, including fire hazards.  Plaintiffs allege:

- "Detective Gildon obtained Arlington training records for Officer Elliot and the Defendant Officers.  Records indicated that they all completed electronic control weapon (Taser) training in 2017, and that they were certified and approved to carry and operate Tasers as of July 10, 2017.  Sergeant Jefferson completed his annual Taser training on February 5, 2017, Officer Guadarrama completed his annual training on February 28, 2017, and Officer Elliot completed his annual training on June 3, 2017."[76]

- "As indicated elsewhere in this pleading, Sergeant Jefferson, Officer Guadarrama, and Officer Elliott received Taser update training in year 2017 before Mr. Olivas was Tased."[77]

- "The concept was not new to [Sgt. Jefferson and Officer Guadarrama] but one they had learned years before.  They were also reminded of this concept just a few months before Tasing Mr. Olivas in year 2017."[78]

Thus, Plaintiffs' own version of facts repeatedly acknowledges that Arlington provided training regarding the use of Tasers near flammable materials.

5.35    Plaintiffs go further and copy a power point slide from Arlington's training program into their live complaint, alleging: "These officers were reminded of what they already knew regarding use of a Taser electronic control weapon in a situation in which flammable substances and/or vapors are present."[79]  Plaintiffs allege that "each officer reviewed the following page and/or reviewed it as a slide in the 2017 training seminar", with the language of the slide providing:

FLAMMABILITY
A TASER ECW can ignite explosive materials, liquids, fumes, gases, vapors, or other flammable substances and materials such as gasoline, sewer gases, meth labs, flammable personal defense sprays, hair gels, butane lighters, etc.  Some personal defense sprays use flammable carriers such as alcohol and could be dangerous to use in immediate conjunction with TASER ECWs.  Some propulsion agents in self defense sprays are flammable.[80]

---

[76]See id. at p.29, ¶ 77 (PageID 28-29) (underlining added).
[77]See id. at p.31, ¶ 83 (PageID 235).
[78]See id. at p.32, ¶ 84 (PageID 236).
[79]See id. at p.31, ¶ 84 (PageID 235).
[80]See id. at p.32, ¶ 84 (PageID 236).

(The actually training slide is shown in Plaintiffs' Original Complaint.[81])

5.36    After acknowledging annual taser training for every officer involved, Plaintiffs launch a grasping argument about "TCOLE credit", contending:

> Arlington's training did not result in those officers receiving TCOLE credit.  They only received in-house Arlington Police Department training credit.  Upon information and belief, this was because Arlington's training did not meet standards high enough for TCOLE credit.[82]

According to Plaintiffs, no training has value in the absence of TCOLE credit.[83]

5.37    First and foremost, this allegation fails to raise any constitutional concern. There is no constitutional requirement that training qualify for "TCOLE credit". Moreover, the argument is disingenuous.  Plaintiffs rely on the same training in their complaints about the use of tasers.[84]  Plaintiffs attempt to walk on both sides of the fence.

5.38    Plaintiffs also cite specific training records for each officer.[85]   As to Officer Guadarrama, Plaintiffs cite Arlington records showing that he had training for "Less Lethal Electronic Control Device Training" on four additional occasions including: (1) eight hours on 12/08/10, (2) four hours on 11/30/12, (3) four hours on 01/31/13, and (4) four hours on  01/21/14.[86]  As to Sgt. Jefferson, Plaintiffs cite records showing that he had training for "Less Lethal Electronic Control Device Training" on five additional occasions, including: (1) eight hours on 07/20/10, (2) four hours on 12/08/10, (3) four hours on 08/31/12, (4) four hours on 02/28/14, and (5) four hours on  01/21/14.[87]

---

[81]*See id.*
[82]*See id.* at p.31, ¶ 83 (PageID 235).
[83]*See id.* at p.31, ¶ 83, p.39, ¶ 95 (PageID 235, 243).
[84]*See id.* at pp.31-38 (PageID 235-42).
[85]*See id.*
[86]*See id.* at p.34-35 (PageID 238-39).
[87]*See id.* at p.36-38 (PageID 240-242).

5.39     Plaintiffs own allegations show that Arlington was not "deliberately indifferent" to the constitutional rights of the Plaintiffs in its training. Moreover, Plaintiffs cannot establish that Arlington's training "actually caused" any constitutional violation; rather, the Plaintiffs repeatedly rely on Arlington's training to show that Tasers "can" ignite flammable substances.[88]  Plaintiffs also admit that all three Arlington police officers involved in the incident were licensed peace officers;[89] accordingly, their failure to train claim fails for that additional reason.  See *Gonzales*, 118 F.Supp.2d at 737.   In short, Plaintiffs own facts show that (1) Arlington was not deliberately indifferent in its training program and (2) Arlington's training program did not "actually cause" Mr. Olivas's death.  The allegations against Arlington related to training (if such allegations are made) should be dismissed for failure to state a claim.  *See* FED. R. CIV. P. 12(b)(6).

## VI.  Relief

6.01     Based on the foregoing, Defendant City of Arlington, Texas prays that the Court dismiss Plaintiffs' claims against Arlington with prejudice, enter a final judgment, and grant any further relief to which Arlington is entitled.

Respectfully submitted,

/s/ Robert Fugate

| | |
|---|---|
| Robert Fugate | City of Arlington |
| Texas Bar No. 00793099 | City Attorney's Office |
| robert.fugate@arlingtontx.gov | Mail Stop #63-0300 |
| Cynthia Withers | P.O. Box 90231 |
| Texas Bar No. 00791839 | Arlington, Texas  76004-3231 |
| cynthia.withers@arlingtontx.gov | Telephone (817) 459-6878 |
| | Facsimile (817) 459-6897 |

ATTORNEYS FOR DEFENDANT
CITY OF ARLINGTON, TEXAS

---

[88]*See id.*
[89]*See id.* at p.33, ¶ 86 (Officer Elliott), p.34-35, ¶ 90 (Officer Guadarrama), & p.35-38, ¶ 91 (Sgt. Jefferson) (PageID 237-42).