UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SELINA MARIE RAMIREZ, individually and as Independent Administrator of, and on behalf of, the ESTATE OF GABRIEL EDUARDO OLIVAS and the heirs-at-law of GABRIEL EDUARDO OLIVAS, and as parent, guardian, and next friend of and for female minor S.M.O.; and GABRIEL ANTHONY OLIVAS, individually, | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |
| Plaintiffs, | §<br>§ | CIVIL ACTION NO. 3:19-cv-01529-LP<br><br>JURY DEMANDED |
| v. | §<br>§ | |
| CITY OF ARLINGTON, TEXAS; JEREMIAS GUADARRAMA; and EBONY N. JEFFERSON, | §<br>§<br>§<br>§ | |
| Defendants. | §<br>§ | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS**

T. Dean Malone
Attorney-in-charge
Texas State Bar No. 24003265
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:   (214) 670-9989
Telefax:       (214) 670-9904
dean@deanmalone.com

Of Counsel:
Michael T. O'Connor
Texas State Bar No. 24032922
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:   (214) 670-9989
Telefax:       (214) 670-9904
michael.oconnor@deanmalone.com

TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 4

II.     ISSUES ............................................................................................................... 6

III.    STANDARD OF REVIEW – Fed. R. Civ. P. 12(b)(6) Motion to Dismiss ........................ 7

IV.     SUMMARY OF PLAINTIFFS' ALLEGATIONS ............................................... 7

V. GOVERNING LEGAL STANDARDS ..................................................................... 12

  A.    Municipal Liability under 42 U.S.C. § 1983 ................................................ 12

  B.    Unconstitutional Use of Excessive Force ..................................................... 13

  C.    Policymaking authority. ............................................................................... 14

VI.     ARGUMENT ................................................................................................... 16

  A. Summary .......................................................................................................... 16

  B.    Plaintiffs plead constitutional violations of excessive force by the individual defendant officers ..................................................................................................................... 16

  C.    Clearly established law prohibits the use of deadly force on a suicidal subject who poses no threat to anyone but himself. ............................................................................... 19

  D.    City policies were a moving force behind the constitutional violations. ...................... 24

  E.    Defendants Jefferson and Guadarrama violated clearly established law are not entitled to qualified immunity. .................................................................................................. 26

  F.    Plaintiffs do no assert state law causes of action, but appropriately seek state law remedies available to Section 1983 plaintiffs. ...................................................................... 28

  G.    Alternative Relief. .......................................................................................... 28

CERTIFICATE OF SERVICE ................................................................................... 30

## Cases

*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ........................... 7

*Bacque v. Leger*, 207 F. App'x. 374 (5th Cir. 2006) ...................................................... 25

*Balle v. Nueces County, Texas*, 690 Fed. App'x. 847, 852 (5th Cir. 2017)................................... 16

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007) ............................................. 7

*Borum v. Swisher Cty.*, No. 2:14-CV-127-J, 2014 WL 4874541, at *11 (N.D. Tex. Sept. 29, 2014).............................................................................................. 29

*Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) ........................................................ 14

*City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988)................................................... 15

*Cole v. Carson*, Nos. 14-10228 & 15-10045, 2019 WL 3928715 (5th Cir. Aug. 20, 2019) ... 24, 27

*Darden v. City of Fort Worth*, 880 F.3d 722 (5th Cir. 2018)............................................ 14

*Doe ex rel. Magee v. Covington Cty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 854 (5th Cir. 2012) (en banc)................................................................................................. 7

*Elizondo v. Green*, 671 F.3d 506 (5th Cir. 2012) ...................................................... 18

*Flores v. City of Palacios*, 381 F.3d 391, 398–399 (5th Cir. 2004) ...................................... 14

*Graham v. Connor*, 490 U.S. 386, 397 (1989) ......................................................... 14

*Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985) ........................................ 15, 26

*Groden v. City of Dallas*, 826 F.3d 280, 284 (5th Cir. 2016) ........................................... 16

*Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737 (1989)................................................ 14, 15

*Landry v. Tex. Dep't of Criminal Justice*, 2017 WL 6209607, at *3 (S.D. Tex. Dec. 8, 2017 .... 29

*Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166–69 (1993) .............................................................................................. 13

*Littell v. Hous. Indep. Sch. Dist.*, 894 F.3d 616, 622 (5th Cir. 2018) ...................................... 7

*Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978) ................................... 13

*Newman v. Guedry*, 703 F.3d 757, 764 (5th Cir. 2012)................................................... 14

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)................................................. 15

*Piotrowski v. City of Houston*, 237 F.3d 567 (5th Cir. 2001) ............................................ 13, 14

*Ramirez v. Fonseca*, 331 F. Supp. 3d 667, 671-72, 673-677 (W.D. Tex. 2018) ......................... 25

*Reyes v. Bridgwater*, 362 F. App'x 403 (5th Cir. 2010)................................................. 25

*Rhyne v. Henderson Cnty.*, 973 F.2d 386, 390-91 (5th Cir. 1992) ................................... 29

*Rockwell v. Brown*, 664 F.3d 985 (5th Cir. 2011) ...................................................... 18

*Tennessee v. Garner*, 471 U.S. 1, 11 (1985)........................................................... 25

*Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc) .................................. 13

*Zarnow v. City of Wichita Falls*, 614 F.3d 161, 167 (5th Cir. 2010).................................... 16

## Rules

Fed. R. Civ. P. 12(b)(6)................................................................................. 7

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiffs file this Response to Defendant City Of Arlington's Motion To Dismiss Under Rule 12(b)(6) and Brief Filed in Response to First Amended Plaintiffs' Original Complaint (ECF No. 23); Defendant Guadarrama's Renewed Motion to Dismiss, and Brief (ECF No. 25); and Defendant Ebony N. Jefferson's Motion to Dismiss First Amended Plaintiffs' Original Complaint and Brief in Support (ECF No. 21); and for such would respectfully show the Court as follows:

I.      INTRODUCTION

Among the rarest occurrences in federal court practice is a Section 1983 complaint that a local governmental body concedes is sufficient to state a cause of action. No matter how detailed the allegations; no matter how egregious the conduct; the obligatory, wholly unnecessary 12(b)(6) motion to dismiss, invariably follows as a matter of course. Never more so than here.

Plaintiffs did not recognize their Complaint from Defendants' characterizations in their original motions to dismiss. Defendants attempted to justify Sergeant Jefferson and Officer Guadarrama's use of deadly force as necessary to rescue the Olivas family (although just how setting a room ablaze with the family in it was supposed to protect the Olivas family Defendants left to the imagination). In an abundance of caution, Plaintiffs repleaded to make crystal clear, if not already so from the Original Complaint, that *at the time the officers shot their Tasers at Mr. Olivas*, there existed no justification whatsoever for the officers' use of deadly force. In stark contrast to the case law relied on by Defendants, Mr. Olivas was threatening harm to no one but himself. He made no provocative gestures or movements. He did not attempt to move toward the officers, or any of his family members. He made no verbal threats that he intended to harm either the officers or his family members. Nor were Mr. Olivas's wife or son in any danger, even if Mr.

Olivas had attempted to set himself on fire. Like the officers, they were, as one defendant stated in the first part of his statement, a safe distance from Mr. Olivas. Further, this was born out by the fact that after the Defendants Jefferson and Guadarrama started a fire, rather than Mr. Olivas, neither was burned or hurt from the fire, aside from attempting to render assistance afterwards. In fact, the only harm faced by the Olivas family was from the officers themselves who, after starting the fire, rushed out in panic, running over Mr. Olivas's wife in the process.

Notwithstanding Plaintiffs' amendment, Defendants double down on their self-defense theory. But it cannot be squared with Plaintiffs' allegations. Defendants ignore the actual allegations of the amended complaint, and abandon the standard of review which requires that inferences must favor the plaintiff, and instead strain to create unreasonable inferences in an attempt to manufacture an alternative exculpatory narrative that is absent from the amended complaint. Allegations contrary to Defendants' narrative are ignored or dismissed as conclusions, although they are not. For example, it is evident that Mr. Olivas never intended to carry out his suicide threat from the pleaded facts that Mr. Olivas did not light himself; he made no provocative gesture as if he was attempting to do so; even after he was sprayed with OC spray (and could not see), he did not attempt to light a fire; and after he was set ablaze by the officers, he continually asked for help.

And even more egregiously, Defendants depict as true the several false statements made by Defendants Jefferson and Guadarrama to cover up their misconduct, without acknowledging that Plaintiff identified such statements as false. Plaintiffs specifically plead that the officers' exculpatory explanations are not true and are contradicted by physical evidence, and therefore cannot reasonably be believed. In short, Plaintiffs have pleaded that Mr. Olivas threatened no one but himself; neither his son or wife (the only family members present) nor the officers were in

danger of being burned if Mr. Olivas had set himself on fire as he threatened; the Defendants had adequate means and time to remove Mr. Olivas's family members from the premises had the officers actually believed they were in danger; Defendants used self-defense and defense of others as post hoc rationalizations to justify their illegal conduct; and Defendants had no justification for firing their Taser weapons under circumstances where they knew it would likely start the very fire which they later, falsely, claimed to be trying to prevent.

If Defendants Jefferson and Guadarrama used their Tasers as a substitute for their firearms to inflict deadly force, as the City seems to concede, and Officer Guadarrama implies in his statement discussed *infra*, they did so without justification. If, on the other hand, they used their Tasers in an attempt to employ non-lethal force, as the individual Defendants seem to argue in their motions to dismiss, they did so with deliberate indifference to the imminent risk of extreme danger of which they were amply aware. Either way, the Defendants utilized unreasonable and excessive force. And they did so both in violation of clearly established law, and with the blessing of, and pursuant to the policies, practices, or customs of the City of Arlington. The actual allegations of Plaintiffs' amended complaint, and the reasonable inferences that must be indulged in Plaintiffs' favor, easily state plausible causes of actions against each defendant. The alternative factual scenarios Defendants present are matters for the factfinder rather than a motion to dismiss.

II.     ISSUES

Whether Plaintiff's First Amended Original Complaint states a plausible cause of action against the City of Arlington for *Monell* liability pursuant to 42 U.S.C. § 1983.

Whether Plaintiff's First Amended Original Complaint states plausible allegations that the conduct of the individual defendants violated clearly established law such that the defense of qualified immunity would be inapplicable.

III.    STANDARD OF REVIEW – Fed. R. Civ. P. 12(b)(6) Motion to Dismiss.

The Fifth Circuit recently summarized the well-known standard for reviewing a Rule

12(b)(6) motion to dismiss as follows:

> We review a district court's dismissal under Rule 12(b)(6) de novo,
> "accepting all well-pleaded facts as true and viewing those facts in the light most
> favorable to the plaintiffs." *Doe ex rel. Magee v. Covington Cty. Sch. Dist. ex rel.
> Keys*, 675 F.3d 849, 854 (5th Cir. 2012) (en banc); *see also Leatherman v. Tarrant
> Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164, 113 S.Ct.
> 1160, 122 L.Ed.2d 517 (1993) (no heightened pleading standard for municipal §
> 1983 liability). To survive a motion to dismiss, a complaint need not contain
> "detailed factual allegations"; rather, it need only allege facts sufficient to "state a
> claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678,
> 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550
> U.S. 544, 555, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ). "A claim has facial
> plausibility when the plaintiff pleads factual content that allows the court to draw
> the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*
> Significantly, a complaint may proceed even if "recovery is very remote and
> unlikely," so long as the alleged facts "raise a right to relief above the speculative
> level." *Twombly*, 550 U.S. at 555–56, 127 S.Ct. 1955.

*Littell v. Hous. Indep. Sch. Dist.*, 894 F.3d 616, 622 (5th Cir. 2018).

IV.    SUMMARY OF PLAINTIFFS' ALLEGATIONS

Plaintiffs detailed factual allegations are alleged at length at pages 6 – 43 (¶¶ 9 – 102[1]) of

the First Amended Plaintiffs' Original Complaint (Dkt 19 ["FAC"]), and Plaintiffs do not attempt

to repeat the entirety of their allegations in this response. For convenience, however, Plaintiffs

direct the Court to certain allegations relevant to the Defendants' motion to dismiss, as follows.

On July 10, 2017, several Arlington police officers responded to a call from a family

member of Gabriel Eduardo Olivas (Mr. Olivas) requesting assistance because Mr. Olivas was

threatening to kill himself by lighting himself on fire after dousing himself with gasoline. (¶¶ 12,

---

[1] Paragraph references are to the FAC unless otherwise indicated.

15, 19, 20) The first responding officers were Defendants Sergeant Ebony Jefferson and Officer Jeremias Guadarrama, along with Officer Caleb Elliott. (¶¶ 20-21) Sergeant Jefferson was the senior officer, with 14 years' experience, and assumed command. (¶¶ 39, 48) Officer Guadarrama had over 9 years' experience, and Officer Elliott approximately 1 year. (¶ 48)

Prior to entering the premises, Sergeant Jefferson noted that Officer Guadarrama had his duty firearm drawn. (¶ 33) Sergeant Jefferson instructed Elliott to draw "less lethal," which Elliott understood to mean a Taser, and Elliott unholstered his Taser. (¶ 39) Jefferson also pulled his Taser, allegedly as a second less lethal option. (¶ 33) Elliott quickly realized, however, that if Mr. Olivas had actually poured gasoline on himself, firing a Taser would likely ignite a fire. (¶ 39) Thus, Elliott understood that although Sergeant Jefferson had used the term "less lethal," a Taser would probably be lethal in the event that Mr. Olivas was covered in gasoline. (¶ 39)  Elliott intended to use his Taser only if he could determine that Mr. Olivas was not covered with gasoline. (¶ 41)

These three officers entered the premises to confront Mr. Olivas in a bedroom. (¶¶ 21-22) Upon entering the bedroom where Mr. Olivas was located, the officers could smell a strong odor of gasoline, and could see Mr. Olivas holding what appeared to be a gas can. (¶¶ 34, 43, 44). Officer Elliott holstered and deactivated his Taser upon recognizing that the presence of gasoline vapors would likely start a fire if a Taser was discharged, even if Mr. Olivas was not covered in gasoline. (¶ 46) Elliott further shouted a warning to Sergeant Jefferson and Officer Guadarrama, who must have heard, stating that "If we Tase him, he is going to light on fire." (¶¶ 46, 74, 82)

Sergeant Jefferson nonetheless removed his Taser and targeted it on Mr. Olivas's chest. (¶ 24, 74) Upon seeing the red dot from Jefferson's Taser on Mr. Olivas's chest, Guadarrama followed suit. (¶ 24) Elliott could see red dots from two Tasers on Mr. Olivas's chest. (¶ 74)

Upon entering the bedroom, Elliott instructed the family members in the room to leave. The family members initially left the room, but then returned, but got no closer to Mr. Olivas than the officers. (¶ 45) Sergeant Jefferson later claimed that upon entering the bedroom he holstered his Taser and attempted to physically remove Mr. Olivas's wife and son from the bedroom, but failed. This is untrue; the officers did not attempt to physically remove the family members from the premises. (¶ 45) Given the diminutive size of Mr. Olivas's son and wife, had the three officers thought it necessary to physically remove them to maintain their safety, they could have easily done so, but instead chose to allow them to remain. (¶¶ 17, 23, 42, 45, 51) It can be logically inferred that the officers made no attempt to physically remove them, because they, like the officers, were a safe distance from Mr. Olivas. In fact, Officer Guadarrama, in one portion of his written statement, stated that the family members were at a "safe distance." (¶ 25)

After Elliott holstered his Taser, he sprayed Mr. Olivas with OC spray in the face. (¶ 49) This effectively blinded Mr. Olivas, and he began rubbing his eyes with his hands. (¶¶ 27, 49) Notwithstanding that Mr. Olivas was blind and distracted from the OC spray, the officers did not attempt to rush him, although they could have easily and quickly done so. (¶¶ 50-52) Nor did they take the opportunity to evacuate the Mr. Olivas's family members from the premises and await the arrival of better trained personnel, such as a SWAT team. (¶ 53, 94)

Shortly after Elliott administered the OC spray, and notwithstanding Elliott's warning, as well as their own knowledge that firing a Taser in such circumstances would likely start a fire, both Jefferson and Guadarrama fired their Tasers at Olivia. (P 54) Four probes from two Tasers struck Mr. Olivas in the chest (which were subsequently removed by paramedics). (¶¶ 26, 54, 56, 68, 81) Officer Elliott stated that he heard the "pop" of a Taser discharge, but did not indicate whether he believed one or two Tasers had been fired. (¶ 54) This immediately started a fire

engulfing Mr. Olivas in flames. (¶ 26, 54) According to Guadarrama, Mr. Olivas then began to run around the room, causing the room to become engulfed in flames. (¶ 26)

At no time did Mr. Olivas threaten to harm anyone other than himself, and each of the officers were aware this was the case. (¶¶ 12, 13) At no time did Mr. Olivas attempt to prevent any family member from leaving the house, or approach or grab any of the officers or either family member. (¶ 15) Nor did he make any provocative gestures or aggressive moves that might have given cause for the officers to fire. (¶¶ 26, 49) And importantly, Olivas never started a fire. (¶ 15) Even after he was sprayed with OC spray, Mr. Olivas did not light himself on fire. (¶ 49) Rather, his threats of suicide appeared merely to be a cry for attention and help rather than an actual attempt to commit suicide. (¶¶ 12, 15) Rather than acting like he wanted to die, Mr. Olivas continually requested help and medication from paramedics after he was severely burned from the fire that the officers started. (¶¶ 56-57)

Neither Jefferson nor Guadarrama provided any rational explanation for why they chose to fire. Officer Guadarrama claimed that he fired "instinctively" rather than because of any articulable, rationale reason. (¶¶26, 28) He further claimed that he did not use his firearm because, he claimed, the "female family member (i.e., Mr. Olivas's wife) was right next to the suicidal male" and he claimed to be afraid that he might strike her. (¶ 25) Guadarrama's statements concerning the close proximity of Mr. Olivas's wife were false. (¶ 25) Not only did they conflict with Guadarrama's earlier statement that the family members were at a safe distance, but also could not be true because Mr. Olivas's wife was not injured or burned by the fire. (¶¶ 25, 29) If she had actually been standing by Mr. Olivas, clearly she would have been engulfed in flames along with Mr. Olivas when he was Tased, which according to Guadarrama, quickly engulfed the entire room. (¶¶ 26, 29) In fact, she must have been behind the officers, because the officers ran

into her with such force as they rushed from the room in a panic after starting the fire that they injured her knee. (¶ 29) Nonetheless, it is a reasonable inference from Guadarrama's explanation as to why he did not shoot his firearm, that he intended to use his Taser as a substitute for his firearm for the purpose of inflicting deadly force, and therefore understood that the Taser would likely cause Mr. Olivas to be set on fire.

Sergeant Jefferson provided inconsistent and false statements, first denying that he fired his Taser, then admitting it. (¶ 35, 80, 81) In his original written statement, Jefferson admitted that he "un-holstered my [T]aser, turned it on and pointed it at the suspect." (¶ 35) When questioned by an investigator, however, he denied pointing his Taser at Mr. Olivas, and further denied firing his Taser at all, and claimed that he dropped his Taser after the fire started. (¶ 80, 81) Then, when confronted with the physical evidence that his Taser had been fired and its prongs were found in Mr. Olivas, he claimed that he unintentionally discharged his Taser. (¶¶ 35, 81)

Contrary to the argument made by Defendant Jefferson in his motion to dismiss, it is a reasonable inference from the factual allegations that Jefferson fired his Taser concurrently with, or at least in rapid succession with Defendant Guadarrama (either before or after), and as a result contributed to starting the fire. (¶ 54) This is so because he targeted Mr. Olivas in the chest; both Tasers struck Mr. Olivas; and the Taser barbs were removed by paramedics from Mr. Olivas's chest. (¶¶ 26, 54, 56, 68, 81) It is unreasonable to believe that Jefferson fired by accident after the fire started and while Mr. Olivas was running around the room. It is beyond belief that Jefferson, by accident, struck a moving target with both prongs of his Taser, striking the same area as Guadarrama, by dropping the Taser without ever aiming it.

As a result of the Taser fire, Mr. Olivas suffered severe burns over 80% of his body and died within a few days. (¶¶ 56-58; *see also* FAC, p. 1)

Immediately after the shooting the three officers met with an attorney at the same hospital where Mr. Olivas was receiving emergency treatment. (¶¶ 30, 35, 68-70)

The City of Arlington did not discipline either Jefferson or Guadarrama. (¶¶ 72, 80, 104) This, among other evidence, demonstrates that the officers utilized excessive force pursuant to the policy, custom, or practice of the City. (¶ 80) Further, the City of Arlington failed to adequately train Jefferson and Guadarrama not to use Tasers in the presences of gasoline vapors, and to use other non-lethal means in such circumstances. Neither officer had had TCOLE-approved Taser training since 2014 (¶¶ 83, 95), and by their conduct each showed that they were insensitive to the high risk of fire from using a Taser in such circumstance, while the rookie officer was highly sensitive to the risk. (¶¶ 46, 54) Moreover, the City allowed its officers unbridled discretion to use Tasers in any circumstance, even as Guadarrama indicated, as a substitute to inflict deadly force in lieu of using a firearm. (¶¶ 25, 102) Officer Guadarrama also had a history of multiple infractions of Department policy, but the City nonetheless continued to employ him. (¶ 103) Consistent with his history of infractions, he failed to heed the warning of Officer Elliott that firing a Taser at Mr. Olivas would start a fire. (¶¶ 46, 54)

## V. GOVERNING LEGAL STANDARDS

### A.    Municipal Liability under 42 U.S.C. § 1983.

Local governmental entities do not enjoy immunity from suit—either absolute or qualified—under § 1983. *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166–69 (1993). Although local governments have no respondeat superior liability, they are liable for a policy or custom that causes a constitutional injury. *See id.*; *see also Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 691 (1978).

To establish municipal liability under § 1983, a plaintiff must show that (1) an official

policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right. *E.g.*, *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5ᵗʰ Cir. 2001). An official policy can consist of written policy statements, ordinances, or regulations, but it can also derive from "a persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Webster v. City of Houston*, 735 F.2d 838, 841 (5ᵗʰ Cir. 1984) (en banc).

A plaintiff must also show that the policy or custom in question "results from the decision or acquiescence of the municipal officer or body with 'final policymaking authority' over the subject matter of the offending policy." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). The policy must have been the moving force behind the constitutional violation, which simply means that "there must be a direct causal link" between the policy and the violation. *Piotrowski*, 237 F.3d at 580.

## B.  Unconstitutional Use of Excessive Force.

"To prevail on an excessive-force claim, [a plaintiff] must show '(1) injury, (2) which resulted directly and only from the use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.' " *Darden v. City of Fort Worth,* 880 F.3d 722, 727–728 (5ᵗʰ Cir. 2018) (citation omitted). Obviously the standard of reasonableness is an objective one, "analyzed 'in light of the facts and circumstances confronting the [officer], without regard to [his or her] underlying intent or motivation.'" *Mason v. Lafayette City-Parish Consol. Gov't*, 806 F.3d 268, 275 (5ᵗʰ Cir. 2015) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)).

In determining whether the force used is excessive, "a court should consider the totality of the circumstances, 'including the severity of the crime at issue, whether the suspect poses an

immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Darden*, 880 F.3d at 728–729 (quoting *Graham*, 490 U.S. at 396). "[I]n an obvious case," these *Graham* excessive-force factors themselves "can 'clearly establish' the answer, even without a body of relevant case law." *Newman v. Guedry*, 703 F.3d 757, 764 (5th Cir. 2012) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)).

"To determine whether a seizure was objectively reasonable, and thus whether an injury is cognizable, [the court asks] 'whether the totality of the circumstances justified [that] particular sort of search or seizure,' . . . 'balanc[ing] "the amount of force used against the need for force."'" *Flores v. City of Palacios*, 381 F.3d 391, 398–399 (5th Cir. 2004) (citations omitted). "This balancing test requires careful attention to the facts and circumstances of each particular case." *Id*. at 399 (citation omitted).

When using force, "officers must assess not only the need for force, and but also 'the relationship between the need and the amount of force used.' " *Darden*, 880 F.3d at 729  (citations omitted).

When numerous officers behave similarly in response to the same situation, it is reasonable to conclude that their conduct is a product of policy rather than anecdotal. *See Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985). As the court explained in *Backe, Grandstaff* "stands for the proposition that a pre-existing custom or practice [of using excessive force] can be demonstrated through the events of a single night, when those events are as 'extreme' as the events in *Grandstaff." Backe,* 2 F. Supp. 3d at 1001 n. 7.

### C.     Policymaking authority.

"[O]nly those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability." *City of St. Louis v. Praprotnik*, 485 U.S. 112,

123 (1988) (plurality opinion) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (plurality opinion)). "[T]he identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge *before* the case is submitted to the jury." *Jett*, 491 U.S. at 737 (emphasis in original). The trial judge is to determine the identity of a municipality's final policymaker by "[r]eviewing the relevant legal materials, including state and local positive law, as well as 'custom or usage' having the force of law." *Id.* at 737 (quoting *Praprotnik*, 485 U.S. at 124 n. 1 (plurality opinion)). "A city's governing body may delegate policymaking authority (1) by express statement or formal action or (2) it may, by its conduct or practice, encourage or acknowledge the agent in a policymaking role." *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 167 (5th Cir. 2010).

" '[T]he specific identity of the policymaker is a legal question that need not be pled' in the complaint to survive a motion to dismiss." *Balle v. Nueces County, Texas*, 690 Fed. App'x. 847, 852 (5th Cir. 2017) (citing and quoting *Groden v. City of Dallas*, 826 F.3d 280, 284 (5th Cir. 2016), and holding that district court erred in concluding the plaintiff was required to plead the identity of the policymaker in order to state a claim)).

VI.     ARGUMENT

A.      **Summary**

It should be common ground with the defendants that a person should not burst into flames when shot by a police officer with a Taser. The purpose of using such "less lethal" means of apprehension is to immobilize the subject *without* using deadly force. When a police officer shoots electrically charged wires into an individual doused in gasoline, the officer does just the opposite – the officer uses extremely lethal force, with predictably deadly consequences. The use of deadly force against a suicidal individual who is threatening no one but himself is excessive, and unconstitutional. When a subject is threating to self-immolate, the police should not provide the match.

It is imminently plausible that any officer who would shoot a Taser at a suicidal individual doused in gasoline suffers from a serious lack of training and policy guidance from his employer both in the use of Tasers and the escalation of force. When two do it simultaneously, particularly when one is of supervisor rank, one may reasonably conclude that they are acting pursuant to the customs and policies blessed by their employer. Moreover, it is more than plausible that an employer who fails to discipline or terminate an officer for repeatedly lying about his egregious misuse of a Taser to burn a subject to death, both condones the officer's conduct and fosters a culture of excessive force. Plaintiffs plainly plead constitutional violations for which the City of Arlington has *Monell* liability.

B.      **Plaintiffs plead constitutional violations of excessive force by the individual defendant officers.**

Defendant City of Arlington first argues that Plaintiffs fail to allege any constitutional violation against the individual defendants for which the City could have *Monell* liability. The City

accepts that the officers used deadly force against a suicidal subject by firing Tasers at him while he was doused in gasoline. The City does not contend that the officers' use of Tasers in this circumstance was a mistake or that they did so in violation of City policy or the officers' training. Rather, the City argues that the City provides its officers with the discretion to use Tasers to inflict deadly force if they deem it necessary. Thus, the City appears to argue that the officers intentionally shot Tasers at Mr. Olivas knowing they would likely set him ablaze, but were justified in doing so because they feared for the safety of family members the officers had allowed to remain in the room them. This is consistent with Officer Guadarrama's claim in his written statement that he chose to use a Taser rather than his gun. Accordingly, the only issue the City raises as to whether Plaintiffs have adequately alleged constitutional violations is whether the use of Tasers to inflict deadly force against Mr. Olivas states an excessive force claim. Contrary to the City's argument, it clearly does.

The City relies on *Rockwell v. Brown*, 664 F.3d 985 (5th Cir. 2011), and *Elizondo v. Green*, 671 F.3d 506 (5th Cir. 2012), to argue that officers may constitutionally utilize Tasers to inflict deadly force by setting the subject afire. The cases relied on by the City have little in common with the facts of the present case. In both *Rockwell* and *Elizondo* the officers used their service revolvers (not Tasers) to shoot and kill individuals who were then in the process of aggressively approaching or attacking the officers. This is nearly the opposite of Plaintiffs' allegations.

Plaintiffs allege that at the time officers shot their Tasers, Mr. Olivas was threatening no one but himself, and that the officers had more than sufficient opportunity throughout the incident to secure the family members without resorting to deadly force. These facts clearly distinguish Plaintiffs' allegations from *Rockwell* and *Elizondo*, where the officers were under attack by the subject. The additional cases cited by the individual Defendants are of similar ilk to those relied

on by the City, and are plainly distinguishable on the same basis. As discussed below, a large body of circuit authority holds that the law is clearly established that officers may not inflict deadly force against a suicidal individual who is threatening no one but himself.

The City further argues that the officers shot their Tasers because they feared the subject would set off a fire and that the officers or nearby family would be in danger from the fire. Although this is apparently what the officers maintain, what Plaintiffs actually alleged is that the officers contentions in this respect make no sense, but are part of a confused and contradictory cover story that should have been readily discounted by their employer and cannot be accepted by any factfinder. Quite simply, if the officers actually believed that Mr. Olivas's wife or any other family member was in danger of being burned by a fire that Olivas may have lighted, why would the officers act to set off a fire and create the very danger they claim to have feared? This is a nonsensical justification. The explanations the officers offered up after consulting with an attorney cannot be squared with starting the very fire they claimed to have feared. Here, conduct clearly speaks louder than words. Regardless, the officers unquestionably knew that utilizing a Taser in these circumstances would likely cause a fire. If they did not know so from the non-TCOLE training the City provided, they knew so because the junior officer among them verbalized the warning that firing Tasers would set Olivas on fire. That Sergeant Jefferson and Officer Guadarrama both chose to shoot their Tasers notwithstanding the high risk of causing a fire shows that they believed both they and any nearby family members were at a safe distance, just as Guadarrama stated in a conflicting portion of his statement. Thus, Plaintiffs have alleged that the factfinder can, and likely will, conclude that there existed no imminent peril and no need to use deadly force, much less deadly force with a Taser.

**C.      Clearly established law prohibits the use of deadly force on a suicidal subject who poses no threat to anyone but himself.**

Clearly established law cautions against use of deadly force on a person who is suicidal and poses no threat to anyone besides himself. Clearly established law also recognizes that the fact that a suspect is armed does not *ipso facto* justify the use of deadly force. *Garner* establishes these principles by negative implication and case-law subsequent to *Garner* confirms them. The individual Defendants had ample notice that, under the circumstances, the use of deadly force was not objectively reasonable.

For example, in *Weinmann v. McClone*, 787 F.3d 444, 450-51 (7th Cir. 2015), the Seventh Circuit said that the use of deadly force on a suicidal person who was not "threatening anyone save himself" violated clearly established law. *See also Williams v. Indiana State Police*, 797 F.3d 468 (7th Cir. 2015) ("We are aware that officers responding to a scene in which a suicidal person is locked in a room are faced with the difficult determination as to whether delay in responding will allow the person to further harm himself or become aggressive toward others. It is clearly established, however, that officers cannot resort as an initial matter to lethal force on a person who is merely passively resisting and has not presented any threat of harm to others."); *Estate of Escobedo v. Bender*, 600 F.3d 770 (7th Cir. 2010) (holding that clearly established law prohibited the excessive use of tear gas on a decedent who "had mental health issues and a gun, but there was no indication that [the decedent] had been using a gun recently or that [the decedent] had ever used a gun in a violent manner," and the decedent "did not point his gun at anyone but himself" and there was no concern that the decedent "was an imminent threat to others."); *cf. Fisher v. Harden*, 398 F.3d 837, 848 (6th Cir. 2005) ("Every alleged case of attempted suicide does not include threats to others.").

The Eleventh Circuit reached the same conclusion in *Mercado v. City of Orlando*, 407 F.3d 1152, 1157-58 (11th Cir. 2005). In that case, the officers responded to the plaintiff's home after his wife reported that the plaintiff was suicidal. *Id.* at 1154. The police found the plaintiff sitting on the kitchen floor, with a telephone cord wrapped around his neck, crying, bleeding from self-inflicted cuts to his arms, and holding a knife in both hands and pointing it towards his heart. *Id.* The officers identified themselves and ordered the plaintiff to drop the knife at least two times; the plaintiff refused "without making any threatening moves toward the officers." *Id.* Fifteen to thirty seconds after giving that order, an officer standing approximately six feet away from the plaintiff, fired a Sage Launcher[2] twice, hitting the plaintiff once in the head. *Id.* at 1154-55. The impact fractured the plaintiff's skull, resulting in extensive brain injuries. *Id.* at 1155. The Court explained: "Because he was not committing a crime, resisting arrest or posing an immediate threat to the officers at the time he was shot in the head, if [the officer] aimed for [the plaintiff's] head, he used excessive force when apprehending [the plaintiff]." *Id.* 1157-58.

The Fourth Circuit held the same in *Cooper v. Sheehan*, 735 F.3d 153 (4th Cir. 2013), when it found as clearly established that "the mere possession of a firearm by a suspect is not enough to permit the use of deadly force. Thus, an officer does not possess unfettered authority to shoot a member of the public simply because that person is carrying a weapon. Instead, deadly force may be used by a police officer when, based on a reasonable assessment, the officer or another person is *threatened* with the weapon." *Id.* at 159 (emphasis original). The court concluded that the use

---

[2] "The Sage Launcher is a 'less lethal' munition that fires a polyurethane baton that is 1.5 inches wide, travels approximately 240 feet per second, and delivers a force of 154 foot/pounds of energy -- approximately the energy of a professionally-thrown baseball. The Sage Launcher was designed to be used to protect persons from self-inflicted injury, especially when using a night stick or baton would be unsafe or impractical. The projectile is not designed to penetrate the body, but only to leave bruises." *Id.* at 1155.

**PLAINTIFF'S RESPONSE TO DEFENDANTS'**
**RULE 12(b)(6) MOTIONS TO DISMISS**          Page 20 of 30

of deadly force on a person who was holding a shotgun in the threshold of his home, but making no threats, violated clearly established law. *Id.* at 159-60.

The Fourth Circuit's decision in *Connor v. Thompson*, 647 Fed. Appx. 231, 233 (4th Cir. 2016) (per curium), is also instructive. In *Connor*, a man called 911 to request help because his nephew, Carter, was threatening to kill himself. When the responding officer arrived, Carter "possessed a paring knife, refused to comply with repeated commands to drop the weapon, and continued down the stairs (and thus closer to [the officer]) rather than stopping." *Id.* at 237. The Fourth Circuit affirmed the denial of qualified immunity, reasoning: "As for the knife, we have held that the mere possession of a deadly weapon by a suspect is not enough to permit the use of deadly force" and "holding a weapon in a non-threatening position while making no sudden moves fails to support the proposition that a reasonable officer would have had probable cause to feel threatened." *Id.* at 237-38. Moreover, the officer "had been informed that Carter was suicidal, which could have explained the reason for holding the knife." *Id.* at 238.

The Ninth Circuit has likewise said that the paradoxical use of deadly force to prevent a suicidal person from killing himself is simply not reasonable:

> [W]e assume that the officers could have used some reasonable level of force to try to prevent [the plaintiff] from taking a suicidal act. But we are aware of no published cases holding it reasonable to use a *significant* amount of force to try to stop someone from committing suicide. Indeed, it would be odd to permit officers to use force capable of causing serious injury or death in an effort to prevent the possibility that an individual might attempt to harm only himself. We do not rule out that in some circumstances some force might be warranted to prevent suicide, but...the "solution" could be worse than the problem.

*Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir. 2011).

The First Circuit's decision in *McKenney v. Mangino*, 873 F.3d 75 (1st Cir. 2017), is also helpful. In that case, the police surrounded a suicidal, armed man at his home and engaged in a

stand-off, during which the man walked in and out of his home. *Id.* at 75-78. Approximately five or six minutes after an officer ordered the man to drop his gun and the officer believed that the man pointed his gun at him, the man "nonchalantly" approached a police cruiser with his gun "dangling by his side." *Id.* at 79. At that point, the officer fired two shots, killing the man. *Id.* at 79-80. This Court affirmed the district court's conclusion that the officer did not lawfully use deadly force "against an individual who was suicidal, armed, slow in gait, some distance away from the officer, and had received no commands or warnings for several minutes." *Id.* at 83.

The only facts relevant to the analysis are those known to the officer at the time of the shooting. *Mullenix v. Luna*, 136 S.Ct. 305, 309 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199-200 (2004) (per curiam) (the officer's conduct is evaluated by the "situation he [the officer] confronted."). Any claim that other officers on scene were about to use deadly force is irrelevant. Further, the officers' after-the-fact subjective belief that deadly force was necessary is not relevant as the standard is an objective one based on the facts known to the shooting officer at the time. *Graham*, 490 U.S. at 396-97 (1989) (standard in determining use of deadly force is an objective standard); *see also Fernandez-Salicrup*, 790 F.3d 312, 326 (1st Cir. 2015).

Moreover, even if one assumes that an officer would have been justified in using deadly force upon first arriving, an officer does not continue to retain the right to do so after time passes and the threat diminishes. *See, e.g., Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993)).

For example, in *Ellis*, 999 F.2d at 247, the Seventh Circuit recognized as clearly established that a threatening situation may abate over time and as that happens, the reasonableness of an officer's justification in using deadly force may wane. The Court explained: "When an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity." *Id.* at 247.

In *Rahn v. Hawkins*, 73 Fed. Appx. 898, 900-901 (8th Cir. 2003), the Eighth Circuit said the same thing when it held that although the plaintiff (who was a bank robber) at one time posed a threat to the officers' or the bank teller's safety, clearly established law prohibited the use of force after the immediacy of that threat dissipated (because the plaintiff was attempting to surrender, and had lost consciousness before he was maced a second time).

Both the Sixth and the Ninth Circuits have ruled similarly. *See Dickerson*, 101 F.3d at 1162 n. 9, and *Hopkins v. Andaya*, 958 F.2d 881, 887 (9th Cir. 1992) (holding that even if the use of deadly force was justified initially, "the exigency of the situation lessened dramatically" and the second use of deadly force was unreasonable), *cert. denied*, 513 U.S. 1148 (1995).

Finally, Fifth Circuit law is in accord with the foregoing. Among other authority, this is evident from the Fifth Circuit's recent en banc decision in *Cole v. Carson*, Nos. 14-10228 & 15-10045, 2019 WL 3928715 (5th Cir. Aug. 20, 2019). In that case, police officers shot and killed a suicidal subject without warning, then, as in the present case, lied about what happened. *Id*. at * 1. Although the subject held a gun to his head, the plaintiffs maintained he threatened harm to no one but himself. *See id*. at * 3. The officers, however, maintained they were in fear of being shot, and moved for summary judgment on the ground of qualified immunity defense. *See id*. at * 3-4. The Fifth Circuit held that the parties' competing factual narratives as to whether the suspect posed a threat to the officers must be resolved by a jury. *Id*. at * 6-8. The Circuit Court held that at the time of the shooting in that case (2010), it was clearly established that police officers' use of deadly force where the subject held a gun to his head but posed no immediate threat to the officers or others violated the Fourth Amendment. *Id*. at * 6. Fact issues as to whether the subject posed a threat to the officers precluded summary judgment on qualified immunity. *Id*. at *7-86.

Additionally, in two unpublished opinions, involving circumstances similar to the facts in this case, the Fifth Circuit found that officers who shot armed but non-threatening victims were not entitled to qualified immunity. *See Reyes v. Bridgwater*, 362 F. App'x 403 (5th Cir. 2010); *Bacque v. Leger*, 207 F. App'x. 374 (5th Cir. 2006). In *Reyes*, the evidence required the court to assume that the plaintiff "stood, in his own home, with a kitchen knife at this side, swaying slightly side to side, at a safe distance away from the officers when [the defendant] opened fire." 362 F. App'x at 407. The court also noted that the defendant officer "was responding to a 911 call reporting a domestic disturbance with possible violence" when he arrived on the scene; "he was not, that is, anticipating making a felony arrest, or even necessarily any arrest at all." *Id.* (internal quotation marks omitted). Given these facts, the court found that "there was no 'immediate threat'" as required to justify the use of deadly force. *Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). Similarly, the panel in *Bacque* found that evidence that the defendant officer shot a suspect who "stood motionless with his knife at his side . . . at least ten to forty feet away" and "was not threatening anyone at [the] time" prevented them from concluding that the defendant was entitled to qualified immunity. 207 F. App'x at 376. Both of these cases demonstrate the clearly established principle that even when a weapon is present, the threat must be sufficiently imminent at the moment of the shooting to justify deadly force. *See Luna v. Mullenix*, 773 F.3d 712, 723 (5th Cir. 2014), *rev'd on other ground*s, —— U.S. ——, 136 S.Ct. 305 (2015). *See also Ramirez v. Fonseca*, 331 F. Supp. 3d 667, 671-72, 673-677 (W.D. Tex. 2018) (holding that officer did not have qualified immunity from excessive force claim where he shot subject who was holding a box cutter to his throat but not threatening officer; distinguishing *Elizondo v. Green* and similar authority on basis that individual's threatening action immediately proceeded the officer's use of force).

**D.     City policies were a moving force behind the constitutional violations.**

Plaintiffs' allegations readily connect relevant City policies as moving forces in the constitutional violation. First is the City's escalation of force policy. The City classifies Taser use as a low level of force consistent with its use as a "less lethal" weapon. But in a circumstance such as this, when gasoline or other flammable substances are present, a Taser may be extremely lethal. Thus, the individual defendants readily resorted to using a Taser as their weapon of choice because it was classified at a low level, even as they hesitated in drawing a firearm, but notwithstanding that a Taser in this circumstance could be even more lethal than a firearm. Further, as the City alleges in its motion, its officers have discretion to use Tasers to inflict deadly force, notwithstanding that that other less lethal techniques are available. City policy thereby allows and encourages officers to utilize Tasers in inappropriate circumstances when deadly force is unnecessary and unreasonable and the potentially deadly consequences of a Taser are unreasonable.

When numerous officers behave similarly in response to the same situation, it is reasonable to conclude that their conduct is a product of policy rather than anecdotal. *See Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985). *Grandstaff* "stands for the proposition that a pre-existing custom or practice [of using excessive force] can be demonstrated through the events of a single night, when those events are as 'extreme' as the events in *Grandstaff." Backe v. City of Galveston*, 2 F. Supp. 3d 988, 1001 n. 7 (S.D. Tex. 2014).

In the present case, a sergeant, who was supervising the operation, instructed the officers to use Tasers, and both the Sergeant and an officer with multiple years' experience fired Tasers at virtually the same time under the same circumstance. This demonstrates that the use of a Taser in this circumstance was not an anecdotal mistake of one officer, but was a product of City policy

and poor training. Officers were inappropriately allowed to use Tasers in the presence of flammable substances which would cause "less lethal" to become "more lethal."

The City's training was deficient and a moving force behind the unconstitutional use of excessive force. While it is true that the City training minimally apprised officers that use of a Taser in the presence of flammable substances could cause a fire, it did not train them *not* to use a Taser in such circumstances. In fact, as the City emphasizes in its motion, it trained its officers just the opposite, to use Tasers in the presence of flammable substances to inflict deadly force, as if they are some sort of mini-flame thrower. The purpose of the warning regarding flammables is to prevent the use of Tasers in such circumstances, not to encourage their use. By failing to adopt a policy of prohibiting the use of Tasers when flammable substances are present, and allowing officers discretion to use Tasers to inflict deadly force, the City of Arlington dangerously trained its officer to inflict excessive force with Tasers.

**E.  Defendants Jefferson and Guadarrama violated clearly established law are not entitled to qualified immunity.[3]**

Defendant Jefferson's story has changed at every turn. In his original statement, he admitted to removing and targeting his Taser on Mr. Olivas. When questioned by an investigator, however, he denied pointing his Taser at Mr. Olivas. Jefferson further denied firing his Taser at all, and claimed that he dropped his Taser after the fire started. Then, when confronted with the physical evidence that his Taser had been fired and its prongs were found in Mr. Olivas, he claimed that he accidentally discharged his Taser. Now, in support of a motion to dismiss, he has yet a new

---

[3] For purposes of preserving the issue for any possible appellate review, Plaintiffs further assert that the court-created doctrine of qualified immunity should be reconsidered and should not be available to the individual officers as a defense. *See, e.g., Cole v. Carson*, _ F.3d _, 2019 WL 3928715 , at * 19-21, & nn. 1, 10 (5th Cir. Aug. 21, 2019) (en banc) (Willet, J., Dissenting).

version. He claims he did shoot Mr. Olivas, but did so after the fire was started by Guadarrama and Mr. Olivas was running around the room.

What Plaintiffs allege is that none of these versions are true, except for Jefferson's admission that he aimed his Taser at Mr. Olivas. Jefferson in fact was the first to take aim at Mr. Olivas, prompting Guadarrama to follow suit. Then both officers shot their Tasers and caused Mr. Olivas to be set on fire. It is a reasonable inference that both Jefferson and Guadarrama shot concurrently, or at least in rapid succession, because Officer Elliott observed that laser lights from two Tasers were on Mr. Olivas's chest, and four prongs from two Tasers were subsequently removed from Mr. Olivas's chest. Nowhere in the FAC do Plaintiffs allege that Sergeant Jefferson delayed firing until after Mr. Olivas was on fire, and no such inference may be indulged in his favor.

No reasonable officer in the position of Guadarrama and Jefferson would have shot a subject with Taser under these circumstances, and doing so violated clearly established law. The officers knew that discharging a Taser would probably cause the very fire that they now claim they were trying to prevent, and as a result be lethal. Thus, using a Taser in such circumstances was deadly force. This is precisely the reason the Officer Elliott chose to re-holster his weapon, and warned Jefferson and Guadarrama that Mr. Olivas would "light on fire" if they used Tasers. Further, neither the officers nor Mr. Olivas's wife or son were in danger of being harmed by Mr. Olivas. Mr. Olivas had threatened to harm no one but himself at the time he was shot, and the family members, like the officers, were at a safe distance from Mr. Olivas and would not have been harmed if Mr. Olivas had carried out his threat to set himself on fire. This is evident not only from Guadarrama's original acknowledgement in his statement that family members were at a safe distance, but also from the actual events. None were harmed when the fire erupted from the Taser

shots. It makes no sense that the officers would have fired their Tasers if they believed they were

so close as to burned if their Tasers started a fire. Moreover, the family members must have been

behind the officers when the fire started, otherwise the officers would not have run over Ms.

Ramirez when they ran from the bedroom. And finally, the fact that no one (other than Mr. Olivas)

was harmed by the fire the officers started shows that none would have been harmed if Mr. Olivas

had set himself on fire.

As set forth in part VI(C) above, the law was clearly established at the time of shooting

that an officer may not use deadly force against a suicidal subject who threatens only himself.

**F.    Plaintiffs do no assert state law causes of action, but appropriately seek state law remedies available to Section 1983 plaintiffs.**

Plaintiffs assert no state law causes of action, but rather plead wrongful death and survival

damages as part of the *remedies* available for Plaintiff's Section 1983 claims. *See Rhyne v.

Henderson Cnty.*, 973 F.2d 386, 390-91 (5th Cir. 1992); *Borum v. Swisher Cty.*, No. 2:14-CV-127-

J, 2014 WL 4874541, at *11 (N.D. Tex. Sept. 29, 2014). The Fifth Circuit has held that 42 U.S.C.

§ 1988 incorporates state law wrongful death and survival remedies under Section 1983, thereby

allowing certain surviving relatives of individuals killed as a result of Section 1983 violations to

recover damages arising out of the wrongful death. *Borum*, 2014 WL 4874541, at *11 (citing

*Rhyne*, 973 F.2d at 390-91).

**G.    Alternative Relief.**

In the alternative, in the unlikely event the Court concludes that Plaintiff's Amended

Complaint fails to state a claim for relief, Plaintiffs request the opportunity to amend to correct

any such deficiencies. *See, e.g., Landry v. Tex. Dep't of Criminal Justice*, 2017 WL 6209607, at

*3 (S.D. Tex. Dec. 8, 2017).

Respectfully submitted,


_____/s/ T. Dean Malone_____
T. Dean Malone
Attorney-in-charge
Texas State Bar No. 24003265
Law Offices of Dean Malone, P.C.
900 Jackson Street
Suite 730
Dallas, Texas 75202
Telephone:    (214) 670-9989
Telefax:        (214) 670-9904
dean@deanmalone.com

Of Counsel:

Michael T. O'Connor
Texas State Bar No. 24032922
Law Offices of Dean Malone, P.C.
900 Jackson Street
Suite 730
Dallas, Texas 75202
Telephone:      (214) 670-9989
Telefax:         (214) 670-9904
michael.oconnor@deanmalone.com

Attorneys for Plaintiff

CERTIFICATE OF SERVICE

I hereby certify that on September 10, 2019 I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court, and the electronic case filing system sent a notice of electronic filing to the following attorneys:

Robert Fugate
Cynthia Withers
City of Arlington
City Attorney's Office
Mail Stop #63-0300
P.O. Box 90231
Arlington, Texas 76004-3231
ATTORNEYS FOR DEFENDANT
CITY OF ARLINGTON, TEXAS

Edwin P. Voss, Jr.
Michael L. Martin
Brown & Hofmeister, L.L.P.
740 East Campbell Road, Suite 800
Richardson, Texas  75081
ATTORNEYS FOR DEFENDANT
JERMIAS GUADARRAMA

Scot D. Levine
Baxter W. Banowsky
Banowsky & Levine, P.C.
12801 N. Central Expressway
Suite 1700
Dallas, Texas  75243
ATTORNEYS FOR DEFENDANT
EBONY N. JEFFERSON

_____/s/ T. Dean Malone_____
T. Dean Malone

**PLAINTIFF'S RESPONSE TO DEFENDANTS'**
**RULE 12(b)(6) MOTIONS TO DISMISS**        Page 30 of 30